UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| PATRICIA D. MASTERSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-01207-LJM-DML |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Patricia D. Masterson ("Masterson"), requests judicial review of a final decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), who found that Masterson was not entitled to a period of disability and Disability Insurance Benefits.  The Court rules as follows.

## I. BACKGROUND

Masterson was born on June 9, 1952.  R. at 188.  Masterson's date last insured was December 31, 2004; she was fifty-two years old at that time.  *Id.*  Masterson completed high school and four years of college.  R. at 144.  After graduating, she worked as a registered nurse and nursing care manager for over twenty years.  R. at 144, 230, 256, 955-56, 1212-13.  Masterson claims she became disabled on November 12, 1999, following an injury at work and subsequent treatments that caused her pain on the right side of her neck, shoulder, and back.  R. at 144, 194, 214.  She also claims that the compounded effects of depression, migraine headaches, fibromyalgia, thoracic outlet

syndrome, degenerative disc disease, and asthma have resulted in pain and weakness so severe as to prevent all work activity.  R. at 150, 1223-34.

Masterson's health problems began long before her claimed disability date. Masterson was originally injured at work in October 1994.  R. at 981.  Complaining of pain on the right side of her neck and back, Masterson saw several orthopaedic surgeons.  *Id.* She underwent rotator cuff surgery in 1995, and again in 1996.  R. at 318, 981.  In May 1998, Dr. Russell Dilley ("Dr. Dilley") performed a rib resection, which only provided relief for a few months.  R. at 593, 598, 608.  Masterson also attended several physical therapy sessions.  R. at 318, 981-82.  In June 1998, Masterson was diagnosed with fibromyalgia complicated by some mild depression and anxiety.  R. at 494.

In June 1999, Masterson was reinjured while holding a patient for an epidural.  R. at 368, 981.  She attended physical therapy sessions to deal with this reaggravation, but physical therapy was discontinued in November 1999 due to lack of improvement. R. at 357-63, 368, 995.

On January 10, 2000, Dr. David O'Brien ("Dr. O'Brien") examined Masterson.  R. at 981.  Masterson described pain burning and radiating down her entire right arm, with some numbness and tingling in the small finger on her left hand.  *Id.* Dr. O'Brien recommended a day treatment program with occupational and physical therapy.  R. at 983.  Dr. O'Brien also recommended psychological intervention to help Masterson with her depression, as well as acupuncture and relaxation.  *Id.* On June 23, 2000, Masterson completed a two-month pain management program administered by Dr. Karl Manders ("Dr. Manders").  R. at 961.   She scored high in the program.  R. at 961-65.

2

On June 27, 2000, Dr. Daniel Venezia, Jr. performed a neuropsychological examination on Masterson. R. at 300-05. While not indicating any identifiable pattern of neurologic disease or disorder, the results did indicate that Masterson suffered from significant depression that could affect her ability to return to work as a nurse. R. at 304-05.

Dr. Dilley examined Masterson on several occasions over the two years following Masterson's May 1998 rib resection. R. at 278-79, 282, 286-91. On April 24, 2001, Dr. Dilley concluded that Masterson's right arm was 100% impaired. R. at 278. Dr. Dilley saw little potential for improvement. *Id.*

On October 17, 2001, Dr. John Cummings ("Dr. Cummings"), recommended a right C6 selective nerve root block. R. at 864-66. On October 25, 2001, Dr. Jonathan Gentile II ("Dr. Gentile") performed the operation. R. at 861. On November 7, 2001, Dr. Cummings examined Masterson and noted that Masterson reported improvement from the operation. R. at 860. Dr. Cummings was not convinced this improvement would be sustained, however, suggesting that this improvement was a short-term result of the medication used for the surgery. *Id.* When Masterson returned complaining of pain in her right arm, Dr. Cummings recommended a stellate ganglion block as a final attempt, on his part, to curb the pain. R. at 1096. Dr. Gentile performed a right stellate ganglion block[1] on Masterson on three separate occasions: January 21, February 20, and May 13, 2002. R. at 706-07, 716-17, 726-27.

---

[1] A right stellate ganglion block is defined as an "injection of local anesthetic solution in the stellate ganglion." *See* Stedman's Medical Dictionary 230 (28th ed. 2006).

On May 28, 2002, Masterson visited Dr. Dilley complaining of pain.  R. at 332.  Dr. Dilley gave her a one-month prescription for Vicodin.  *Id.*  Dr. Dilley noted continued significant impairment in her right arm and the beginning of symptoms on the left side of her body as well.  *Id.*  On May 27, 2003, Masterson again visited Dr. Dilley.  R. at 331. Masterson still complained of pain on her left side as well as her right.  *Id.*  Dr. Dilley prescribed Ultram to help with the pain.  *Id.*

The record indicates that Masterson was evaluated several times to determine her ability to return to work at the hospital.  On July 6, 2000, Tyler Nichols ("Nichols"), a physical therapist, performed a functional capacity evaluation ("FCE") of Masterson to determine a list of potential job restrictions.  R. at 929-54.  Nichols recommended the following restrictions: sitting for no longer than forty-five minutes at a time; static standing for no longer than fifteen minutes at a time; dynamic standing and walking for no longer than thirty minutes at a time; lifting from floor to waist level no more than ten pounds one time per hour; and carrying at waist level no more than fifteen pounds over a distance of thirty feet one time per two hour period.  R. at 929.  Nichols also recommended that Masterson be allowed the use of a TENS unit, an ice massage break every one and one-half to two hours, and a brief stretch break at least once per hour.  R. at 930.

On November 20, 2001, Wade Lytle ("Lytle"), a physical therapist, performed a second FCE of Masterson.  R. at 879-81.  Dr. Cummings had ordered the FCE to determine whether Masterson could return to work at the hospital and, if so, to recommend any appropriate work restrictions.  *Id.*  Lytle indicated that Masterson gave "sub-maximal effort," but clarified that this was not necessarily due to any intent on Masterson's part.  R. at 879.  However, Lytle indicated that Masterson was able to simulate the physical

demands necessary to return to sedentary occupations, including work similar to that of a secretary or receptionist. R. at 880. The recommended work restrictions included unrestricted sitting, standing of no more than thirty minutes without a sit down break, material handling of ten pounds or less on an occasional basis from floor to waist, material handling of negligible weight on a frequent basis, no reaching above shoulder height, and allowance for use of a TENS unit as needed for pain reduction. *Id.* Dr. Cummings expressed some criticism of the contents of the FCE. R. at 1096. However, it is unclear in the record whether Dr. Cummings disagreed with Lytle's conclusion that Masterson could perform sedentary work. *Id.*

On March 18, 2002, Dr. J. Sands ("Dr. Sands") performed a Physical Residual Functional Capacity Assessment ("RFC") of Masterson to determine her ability to work. R. at 741-48. Dr. Sands found that Masterson had no manipulative limitations, including in her fingers. R. at 744. However, on October 23, 2003, a second RFC, performed by Dr. A. Dobson ("Dr. Dobson"), revealed the opposite. R. at 275. Dr. Dobson, a state agency physician, found Masterson to have constant trouble reaching with her left hand and frequent trouble reaching overhead with her right hand. R. at 271. Dr. Dobson concluded that both of Masterson's hands had limitations with handling, fingering, and feeling. *Id.* Dr. Dobson found that Masterson could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand and walk about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. R. at 269. Dr. Dobson also noted that "certain allegations [by Masterson] exceed medical findings." R. at 273.

Masterson applied for DIB in October 2002, stating that she had been disabled since November 12, 1999. R. at 194. After her initial application and request for reconsideration

5

were denied, Masterson requested a hearing with an Administrative Law Judge ("ALJ"). R. at 171-76, 180-87.   On June 10, 2005, Masterson appeared with counsel at an administrative hearing before the ALJ.  R. at 1209.  Michael Blankenship ("Blankenship") testified as a vocational expert.  R. at 163, 1209, 1234-38.

The ALJ questioned Masterson regarding her physical and mental condition.  R. at 1212-34.  Masterson testified that she had constant pain in her back, shooting pain in her neck, and burning pain down her right arm.  R. at 1218-19.  Masterson also testified that this burning pain was beginning in her left arm as well.  R. at 1219.  Masterson described persistent, aching pain in her legs similar to a constant toothache.  *Id.*  Masterson explained that the pain increased while performing daily activities.  R. at 1221.  Masterson testified that she treated the pain with ice packs, rest, and the pain medication Ultram.  R. at 1222.  Masterson also testified that she suffered from debilitating migraine headaches approximately four times per month, which she treated by resting, avoiding light and sound, and by taking the pain medication Topomax.  R. at 1223-24.  Masterson also testified that she suffered from depression, which she treated with Wellbutrin and Effexor.  R. at 1227.  In addition, Masterson testified that she used Seroquel and Trazodone to help her sleep; Protonix for her gastric problems; and Allegra, Albuterol, Advair, Maxair, and Singulair for her allergies and asthma.  R. at 1230.

In addition, Masterson testified that she was able to live alone; cook, clean, and shop for herself; and manage her own finances.  R. at 1229-29.  Masterson also stated that she could not lift anything heavier than a gallon of milk, was not able to do any repetitive motions with her arms, required a couple naps during the day, and could sit for fifteen minutes and walk for thirty minutes before requiring rest.  *Id.*

6

The ALJ asked Blankenship whether, taking into consideration the physical limitations described by Masterson in her testimony, an individual of Masterson's age, education, and work experience could perform any work in the economy. R. at 1235. Blankenship testified that such an individual could perform unskilled light and sedentary occupations, including those of interviewers (581 in Indiana at the sedentary level; 1,676 at the light level) and receptionists and information clerks (1,859 in Indiana at the sedentary level; 1,394 at the light level). R. at 1235. Blankenship stated that his testimony was consistent with the Dictionary of Occupational Titles. R. at 1237.

On December 18, 2006, the ALJ decided that Masterson was not disabled. R. at 154. On July 7, 2008, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Masterson's request for review. R. at 7. Pursuant to 42 U.S.C. § 405(g), Masterson filed this civil action for judicial review of the Commissioner's final decision.

## II. DISABILITY AND STANDARD OF REVIEW

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A). In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

7

2.    If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3.    If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4.    If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5.    If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, then it shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. §405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See, e.g.*, *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## III. <u>DISCUSSION</u>

### A. THE ALJ'S FINDINGS

The ALJ found that Masterson satisfied steps one and two of the five step evaluation procedure for analyzing disability claims. R. at 145. First, she was not engaged in substantial gainful activity since the alleged onset date. *Id.* Second, there was objective medical evidence of impairments that significantly interfered with her ability to perform basic work activities. *Id.*

The ALJ found that Masterson did not meet the requirement for disability listed in step three. *Id.* Namely, none of Masterson's impairments were attended by medical signs or laboratory findings that met or equaled in severity any impairment contained in the Listing of Impairments. *Id.*; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1. Also, the ALJ determined that Masterson's claim of disabling pain was not credible. R. at 151. The ALJ based his credibility determination on the five following factors: (1) Masterson's daily activities; (2) Masterson's submaximal performance on an FCE; (3) Masterson's refusal of physical therapy; (4) Masterson's "excessive medication regimen;" and (5) Masterson's trip to Florida.

Between steps three and four, the ALJ determined that Masterson had the residual functional capacity to perform a significant range of light work. R. at 152-53. At step four, the ALJ found that Masterson was not able to perform her past relevant work as a nurse. R. at 152. At step five, the ALJ concluded that there were a significant number of jobs that existed in the economy that Masterson could perform. *Id.* Therefore, the ALJ concluded that Masterson was not disabled. *Id.*

9

## B. MASTERSON'S ARGUMENT ON APPEAL

Masterson makes four arguments on appeal but the Court need only condsider her first.   Masterson   argues   that   the   ALJ's   credibility   findings   were   based   on mischaracterizations and omitted evidence in violation of SSR 96-7p.

Credibility must be considered "[w]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence."  SSR 96-7p.  When weighing the credibility of Masterson's claims of debilitating pain, the ALJ must consider seven factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain; (3) precipitating and aggravating symptoms; (4) the type, dosage, effectiveness, and side effects of medication; (5) additional treatment for pain, other than medication; (6) any measures other than treatment to relieve pain; and (7) any other factors concerning functional limitations.  20 C.F.R. § 404.1529(c)(3); SSR 96-7-p.

Masterson points to four specific instances where she claims the ALJ either mischaracterized or omitted important evidence.  First, Masterson argues that the ALJ mischaracterized Lytle's comment on the November 2001 FCE that Masterson's performance was submaximal.  R. at 151, 879.  The Court agrees.  In his decision the ALJ stated "I also note [Masterson's] credibility undermined by her submaximal performance on the physical therapy work/functional assessment."  R. at 151.  However, as Masterson correctly notes, Lytle wrote in the FCE that a finding of submaximal effort was "by no means  implying  intent.   Rather,  it  is  simply  stated  that  Miss  Masterson  can  do  more physically at times than was demonstrated during this testing day."  R. at 879.  If there was no intent to give submaximal effort, the Court fails to see how this undermines Masterson's

10

credibility.  Therefore, the ALJ's credibility determination based upon Lytle's note is not supported by substantial evidence.

Second, Masterson argues that the ALJ, when weighing her credibility, pointed to one occasion where Masterson had refused physical therapy but omitted several other occasions where she had attended physical therapy.  The ALJ noted that Masterson "was offered the option of participation in physical therapy by the neurologist, which she declined, without offering any reason for this refusal."  R. at 151.  The record indicates that on one occasion Masterson declined the option of physical therapy presented to her by Dr. Caryn Vogel ("Dr. Vogel"), a neurologist.  R. at 1100.  Nevertheless, the record indicates that Masterson attended forty-four physical therapy sessions before being discharged in November 1999 for lack of improvement.  R. at 995.  From April until June 2000, Masterson also attended physical therapy as part of a pain management program.  R. at 307.  Citing Masterson's refusal of physical therapy on one occasion as evidence undermining her credibility is a mischaracterization of the record.  In addition, just because Dr. Vogel's note did not list a reason for Masterson's refusal to pursue additional physical therapy does not necessarily indicate that Masterson did not give a reason for this refusal.  Perhaps Dr. Vogel did not consider it important enough to include in his note.  If the ALJ was concerned about the reasoning behind Masterson's refusal, he could have asked Masterson about it during the hearing; but he did not.  Thus, the ALJ's credibility determination was further compromised by a failure to properly consider all of the relevant evidence.

Next, Masterson argues that the ALJ essentially accused her of over-medicating and drug-seeking behavior after mischaracterizing two doctor's notes.  R. at 151.  When weighing Masterson's credibility, the ALJ concluded that "[d]espite suggestions her

11

conditions does [sic] not warrant this excessive medication regimen, [Masterson] refuses to eliminate any of it." *Id.* As support for this conclusion, the ALJ referenced two doctor's notes. *Id.* On June 1, 2004, Dr. Dilley wrote that "Masterson was back in followup of thoracic outlet syndrome. All she really wanted was some Ultram." R. at 1152. While this note could be interpreted negatively as drug-seeking behavior, it could also be viewed as a mere statement of fact. The latter interpretation is, perhaps, more plausible considering that Dr. Dilley gave Masterson the prescription. *Id.*

The ALJ referenced a second doctor's note to support his belief that Masterson was over-medicating. While it is unclear exactly which note the ALJ was referencing,[2] it is most likely one Dr. Vogel wrote on December 2, 2004. R. at 1099-100. While Dr. Vogel listed twenty-one medications being taken by Masterson and recommended that Masterson discuss "streamlining" her medications with her family doctor, Dr. Vogel actually increased Masterson's daily dosage of Topomax and expressed reluctance at taking Masterson off certain medications. On its face, Dr. Vogel's note does not support the assertion by the ALJ that Masterson was over-medicating. There is no direct evidence that Masterson's doctors would agree with the ALJ's assertion. Therefore, the ALJ's reliance on this evidence is misplaced.

Finally, Masterson argues that the ALJ mischaracterized a trip to Florida as undermining her credibility. R. at 151. The ALJ mentioned that "a medical note in November, 2003, related that Masterson was in Florida." *Id.* The ALJ failed to explain how or why this undermined Masterson's credibility. While the ALJ may have viewed the trip

---

[2] The ALJ only mentioned that the note was written in December 2004 and that it indicated that Masterson was taking approximately twenty-one medications.

as an activity that lends support to his decision that Masterson was not suffering from debilitating pain that precludes her from working, his decision fails to make this connection.

The only other evidence the ALJ referenced when analyzing Masterson's credibility was Masterson's daily activities. However, the ALJ failed to explain this evidence in sufficient detail. The ALJ merely stated that "[Masterson's] activities clearly indicate she is able to function in the workplace." R. at 151. Elsewhere in the opinion the ALJ noted that "[Masterson] is able to cook, clean and shop, along with driving a van and going to church, activities at least consistent with work at the level I have assessed." R. at 150-51. But the ALJ's lack of detail in describing his reliance on Masterson's daily activities when assessing her credibility, coupled with the mischaracterizations of the evidence, require that this case be remanded. As a result, the Court need not consider Masterson's other arguments.


## V. **CONCLUSION**

For the foregoing reasons, the final decision of Michael J. Astrue, the Commisioner of the Social Security Administration, is **REMANDED**.

IT IS SO ORDERED this 30th day of March, 2010.

_LARRY J. McKINNEY, JUDGE_
United States District Court
Southern District of Indiana

Distribution attached.

Distribution to:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov